IN THE UNITED STATES DISTRICT COURT FOR THE
DISTRICT OF KANSAS

DENA BULLARD,

     Plaintiff,

  Vs.          No.  09-4024-SAC

THE GOODYEAR TIRE
AND RUBBER COMPANY,

     Defendant.

MEMORANDUM AND ORDER

    The case comes before the court on the defendant Goodyear Tire

and Rubber Company's ("Goodyear's") motion for summary judgment.  (Dk.

68).   The plaintiff Dena Bullard ("Bullard") brings this employment

discrimination case alleging Goodyear unlawfully terminated her in

retaliation for protected opposition to discrimination under Title VII of the

Civil Rights Act of 1965 ("Title VII"), 42 U.S.C. § 2000e *et seq.*, and to

prohibited practices under the National Labor Relations Act ("NLRA"), 29

U.S.C. § 151 *et seq.*, and unlawfully terminated her on the basis of her

gender in violation of Title VII and on the basis of her age in violated of the

Age Discrimination in Employment Act ("ADEA"), 29 U.S.C. § 621 *et seq.*

Goodyear contends that Bullard, a salaried management employee, had

been disciplined many times resulting in a Last Chance Letter agreement

that provided she would face termination without improvement in specified

areas.  In September of 2007, Bullard disciplined an employee under her supervision for a workmanship error without waiting for her supervisor's final decision.  Goodyear asserts it terminated Bullard for insubordination and violation of her last chance agreement because she imposed a lower level of discipline than her supervisor ultimately decided.

**STATEMENT OF FACTS**

<u>General Background</u>

Bullard began working at Goodyear in May of 1975, and she was 54 years old when she was terminated on September 17, 2007.  Bullard was an area manager, that is, a front line supervisor of hourly employees working in a particular manufacturing area.  The hourly employees at this plant are members of the United Steel Workers Union and covered by a collective bargaining agreement.  The responsibilities of area managers include enforcing safety and quality policies and maintaining the scheduling and business requirements for the particular area.  Area managers are supervised by the value stream managers who are supervised by business center managers.

In 2007, Bullard was one of six area managers in the earthmovers department of the plant.  Of the six, two were women, and the other female manager was 48 years old and had the highest salary of the six managers.  Her monthly salary was over $900 more than the plaintiff's.  The

2

next three area managers on the declining wage scale were males.  The 37-year-old male's monthly salary was approximately $178 more than the plaintiff's, the 35-year-old male's monthly salary was approximately $140 more than the plaintiff's, and the 51-year-old male's monthly salary was approximately $55 more than the plaintiff's.  The last male manager was 39 years old and his monthly salary was approximately $240 less than the plaintiff's.

<u>Disciplinary Record</u>

From 1996 to her termination, Bullard understood that her supervisors, with the exception of one value stream manager, Jim Gilliam, were critical of how she held her employees accountable.  Bullard's personnel file includes documentation of counseling and discipline imposed for a variety of reasons, including her inability to hold subordinates accountable on such matters as attendance.[1]  In December of 2002, Bullard

---

[1]The plaintiff generally objects to these documents in her personnel file and to the statements appearing on them.  The plaintiff bases her objections on hearsay, authentication, and foundation.  A court is to "consider only admissible evidence" for summary judgment purposes, and a proper objection to hearsay evidence precludes the court from relying on the same.  *Johnson v. Weld County, Colo.*, 594 F.3d 1202, 1209 (10th Cir. 2010).  The defendant has submitted a deposition excerpt of Rusty Bryner in which he identifies the disciplinary records as part of the plaintiff's personnel file that he personally reviewed on prior occasions.  With its reply, the defendant also has provided an affidavit of Charles Hollis, Goodyear's personnel records custodian.  Attached to the affidavit are different disciplinary records used as Baer Deposition Ex. 21 that Hollis describes as found in Bullard's personnel file. (Dk. 89-5, p. 2).  Besides authenticating the exhibits, Hollis's affidavit combined with the testimony of Bryner and Bair satisfy the elements for

was found under the influence of alcohol at work and she signed a letter of
commitment to "never" be involved for the remainder of her career "in a
similar situation." (Dk. 93-2, p. 2). In March of 2004, Jeff Whitley, her
business center manager, disciplined Bullard for an attendance violation.
Her personnel record included a memorandum dated April 1, 2004, and
signed by Whitley and Willie Collins. The memorandum recounts that
plaintiff was late to work and smelled of alcohol that was confirmed by the
first sobriety test. (Dk. 89-4, p. 6). She was told that if "tardy or absent
one more time her employment at Goodyear will be in jeopardy." *Id.* The
plaintiff summarily avers: "On April 1, 2004, I was not late and I did not
smell like alcohol." (Dk. 94-9, ¶ 18).[2]

On July 23, 2004, Bullard signed a "Last Chance Letter/Letter of
Commitment" attesting that she had read the letter and agreed to its
"statements, terms and conditions." (Dk. 93-4, p. 2). The letter first
categorized prior disciplinary problems from her employment record to

_____

admissibility under Fed. R. Evid. 803(6). *See Bunker v. City of Olathe, Kan.*,
97 F. Supp. 2d 1241, 1246 (D. Kan. 2000); *Wright v. Wyandotte County
Sheriff's Dept.*, 963 F. Supp. 1029, 1035 (D. Kan. 1997). The plaintiff's
general objections are not effective in keeping these documents out of the
summary judgment record.

[2]The court is not inclined to regard the plaintiff's blanket denial as
controverting the personnel disciplinary record. The same record recounts
the positive sobriety test and the defendant's admission that she had
consumed alcohol earlier. Additionally, the record recounts that the plaintiff
had called in saying "she had just gotten up and would be in shortly." (Dk.
89-4, p. 6).

include:  "numerous attendance issues, violation of substance abuse policy,

workmanship problems, and insubordination."  *Id*.  The letter then described

the most recent event for disciplinary measure:

> On 7/6/04 an incident occurred and around the dispensary in which
> several examples of poor judgment occurred.  The incident involved
> the administration of alcohol and drug testing to an hourly associate
> under Ms. Bullard's authority.  This incident, along with Ms. Bullard's
> previous work record, demonstrated a continued inability to function
> on a managerial level.  It is management's conclusion that the
> underlying issue behind Ms. Bullard's performance in this instance and
> throughout her career is an inability to exercise managerial judgment
> and to demonstrate the standards of integrity and commitment
> necessary to perform as a successful member of management.

*Id*.  Among the disciplinary measures imposed was a six-month probationary

term during which "any failure to exemplify a level of appropriate judgment,

integrity, commitment and overall performance will result in immediate

dismissal."  *Id*.  The letter also said it would "remain on Ms. Bullard for the

balance of her career and shall be a factor in considering disciplinary actions

up to and including discharge should any future performance issues occur

following the period of probation."  *Id.*  The incident referenced as occurring

on July 6, 2004, was that Bullard did not call for and send a member of male

management to witness the urine sample from her male associate who was

suspected of alcohol use.  Instead, Bullard sent a male union representative

to monitor the employee.  Bullard's decision violated drug testing policy, and

management regarded the testing as "botched."

Bullard's personnel file includes a letter dated December 21,

2005, that shows she was disciplined for approving vacation leave for associates in increments smaller than four or eight hour blocks.  Her personnel file includes a letter February 18, 2006, signed by her value stream manager, Willie Collins.  The manager scored Bullard's performance as only "somewhat effective" in seven of the eight behavioral categories.  As far her own assessment of overall performance, Bullard positively described her performance in all areas, even remarking that her "shift overall are the best performers in production."  (Dk. 93-5, p. 3).  In the manager's written evaluation of Bullard's performance, some of the more critical comments include:

> Dena needs to dramatically improve her accountability.  She tries to take care of people to the extreme and people take advantage of her because of it.  Moved Dena from Radial tire room to curing to try to get the tire room performance up.  Dena has good knowledge of all areas of OTR.  Dena spends too much time in other areas . . . .  Dena has made a small improvement on her integrity but is often (almost always) the last person to complete paperwork, etc. . . .  Dena has one of the highest shortage rates of all of the area managers.  Dena does not hold her people accountable for the jobs/systems/procedures that goodyear is paying them to do.  Makes mistakes on discipline that a new associate would make (Dena has 30 years.)  Many notes on record @ mistakes made.

(Dk. 93-5, p. 4).   The agreed "development action plan" included that Bullard needed to improve at holding her associates accountable and at following orders and that Bullard needed to have a performance improvement plan (PIP).

The PIP dated June 1, 2006, was signed by Bullard

acknowledging that it had been discussed with her and she had received a copy of it.  The PIP opens with an explanation that she had received two consecutive ratings of unsatisfactory performance and that measurable improvement was necessary in the following areas:  "Improve Accountability of Associates, Integrity and Acceptance of Peers and Managing the Daily Requirement."  (Dk. 93-6, p. 2).  The PIP notes that Bullard had been counseled for her "handling of associate discipline" and for "her management of absenteeism, vacation, and daily production reporting."  (Dk. 93-6, p. 2). On the PIP, her manager instructed:

> I want to be briefed about your recommendations concerning disciplining your associates who have absenteeism or performance issues.  I want to ensure we are on the right track in dealing with associate disciplinary requirements.
> . . . .
> I would like for you to brief me on all your shortages.  Ensure your associates understand the seriousness of clocking in and out, and that it is their responsibility to follow the proper procedures.

*Id*. at pp. 2-3.

The plaintiff presents her affidavit that contains such blanket statements as:

> 23.  I held my employees accountable and followed proper procedures.
> . . . .
> 25.  I always followed my supervisor's orders to the best of my ability.
> 26.  I performed my work extremely well and very efficiently in accordance with my employer's rules.
> 27.  Willie Collins' problem was that at times he became obsessed with harassing and mistreating employees.
> 28.  I did not participate in Collins' mistreatment of employees.
> 29.  I did not have a problem disciplining my employees, holding

7

employees accountable and management of time off.  The alleged
shortage was the result of my filling other managers shortage to
resolve pay issues.

(Dk. 94-9, pp. 5-6).

For most of the months of October, November and December of

2006, the union employees at the defendant's Topeka plant were on strike.

Bullard's employment record includes a letter dated January 15, 2007,

signed by operations manager, Kevin Pfeiffer, and addressed to Bullard.  The

letter recounts a workmanship error costing the plant approximately $9,400.

The plaintiff avers she has no knowledge or recollection of this event.

<u>Termination</u>

Around May of 2007 in the earthmovers department, Scott Baer

became its value stream manager, and Rusty Bryner became its business

center manager.  So at the time of plaintiff's termination in September of

2007, Baer was Bullard's immediate supervisor, and Bryner was Baer's

immediate supervisor.

On September 12, 2007, the hourly employee, Eric Johnson, an

African-American associate supervised by Bullard, made a workmanship

error by putting two 57-inch tires in the wrong rings or molds.  Such a

mistake causes lost time in making the defective tires and in fixing the

mistake along with the possible loss if the tire is scrapped.  Bullard was not

working that shift when Johnson committed the error, and she learned of the

8

error from an email sent by Anthony Carcamo, a process engineer.  The email is dated September 12, 2007, at 4:38 p.m., and it was sent also to Bullard's supervisor, Scott Baer.  Carcamo wrote that "[t]he situation here is he [Johnson] is in step 4 for workmanship since 6-17-06, taken off three months of strike this guy can go to step 5 if you want."  (Dk. 93-8, p. 3).

Goodyear's discipline system for hourly union employees progressively disciplines from step one through step five, and step five results in termination.  The steps progress during a one-year period, and after a year, an employee's disciplinary steps are dropped off the employee's record absent certain circumstances.  "[S]erious workmanship issues that actually resulted in tires being scrapped were typically advanced from nothing to Step 3."  (McCauley Dep., p. 181, Dk. 69-5, p. 12).  Value stream managers commonly became involved in the decisions on the discipline of hourly employees at step three and higher, particularly when the area managers appeared to lack understanding on the proper standards or were not applying them.[3]

---

[3]The plaintiff cites the testimony of Robert Tripp, a union leader, on his understanding of the collective bargaining agreement and the area manager's direct and immediate involvement in discipline.  This testimony, however, does not effectively controvert the general practices of value stream managers in supervision over disciplinary matters, as Tripp acknowledged, "I can only speak to my supervision, so I don't know necessarily what the structure is in the company depending on the circumstance."  (Dk. 94-7, p. 5, Dep. 19).  Tripp's base of knowledge comes from his union perspective, from his understanding of the collective bargaining agreement and from his experience in dealing with managerial

To Carcamo's email notice of September 12th, Bullard sent an
email reply dated September 13th at 10:29 a.m. that said:  "I will come in
Friday morning to handle Eric.  At this time I am looking to reinstating Step
4, no time off.  There will be an attachment stating his next occurance (sic)
could result in a Step V for workmanship."  (Dk. 93-9, p. 2).  Bullard's
supervisor, Scott Baer, was copied on Bullard's email.  Approximately, an
hour later, Baer sent an email to Bullard and copied Carcamo, and the email
said:  "Dena,  Lets (sic) pull together all the documentation and discuss,
without any details my head was leaning towards Step V."  Bullard replied to
Baer and copied Carcamo, Mike Tipton and Rusty Bryner with the following
email:

> He has not had anything on his record since June 2006.  I believe step
> 4 is the better and logical thing to do.  Do you really want to let him
> go to have him brought back with the same result???  We need his
> presence here.  It will be another year before this would be removed.
> If he has another incident with workmanship then at that time a step V
> would be warranted.  This step 4 would not be with a day off with pay.
> He would remain in house because it is a reinstatement.  The
> documentation on this incident is on Antonio's desk.

(Dk. 93-9, p. 2).  Johnson's employment record shows he was reinstated to

---

staff during these disciplinary matters.  His base of knowledge does not
equip him to know and dispute whether a value stream manager may be
involved in reviewing area manager's investigation and recommendations
and in giving input into an area manager's handling of the discipline.  As for
the terms of the collective bargaining agreement, the court has not been
provided with an authenticated copy of this document, and this agreement
obviously would not govern a value stream manager's supervision of an area
manager.

step three for attendance problems in March of 2007.

Around 4:27 p.m. that same afternoon, Scott Baer called Bullard on her cell phone, as Bullard has left the plant and was on her way home. Baer asked where Johnson's performance records were, and Bullard told Baer that she had them in her personal locker.  Bullard authorized Baer to get the records from her locker.  Bullard's notes of this conversation include:

> Scott said he would review the records because he was still leaning towards a step V.  I again repeated my reasons why a Step IV would be more appropriate.  Scott said he would get back with me after reviewing the records.  I told him to get back with me anytime.  I did not hear back from Scott.

(Dk. 93-11, p. 2).  Bullard testified that Baer never told her to go ahead with a step four or with what she wanted to do if Baer didn't get back with her. Bullard also testified that she assumed that she should go ahead with step four if she didn't hear from Baer.  Bullard also testified she did not recall Baer telling her to waive the hot stove rule in order to have more time to evaluate the infraction and the appropriate discipline.

At 6:45 a.m. on September 14, 2007, Bullard met with Eric Johnson and his union steward, and Bullard reinstated Johnson to step four as the discipline for his workmanship error on September 12th.  Apparently unaware of Bullard's meeting earlier that morning, Baer sent Bullard an email at 7:20 a.m. that stated:  "Eric's last step was for workmanship, this incident is an workmanship issue & cost the department . . . tires trying to

11

correct his mistake.  Please place Eric in Step 5 tonight."  (Dk. 93-12, p. 2).
At 10:06 a.m. on September 14, 2007, Bullard sent an email to another
Value Stream Manager, Mike Tipton, and copied Baer, Carcamo, and Robyn
Stratton.  This email informed them:  "Eric was reinstated into Step 4 of the
pds for workmanship.  The meeting was held at the Lead Hand Station in
1504.  Present were Eric Johnson, Union Rep. Drake Ladusch and myself.
Eric had inserted 2 E5F20's on A93J0 assemblys."  (Dk. 93-13, p. 2).
Bullard testified that she sent this email without having read Baer's email
sent earlier that morning.

  Sometime after Bullard's email, Baer met with Bullard and told
her that he had decided to put Eric Johnson on step five.  Bullard explained
that she had disciplined Johnson already by reinstating him to step four and
that under the CBA she couldn't discipline Johnson twice for the same
offense.  When Baer insisted on Johnson's termination, Bullard agreed to
come in that night and terminate Johnson.  After later talking with Tony
McCauley of human resources and a union steward, Baer learned that
Johnson could not be moved to step five because of Bullard's prior discipline
and the "double jeopardy" policy.  So, Baer subsequently told Bullard not to
put Johnson in step five.

  Baer then recommended to his supervisor, Bryner, that Bullard
be disciplined for acting contrary to his directive on Johnson's discipline.

12

Bryner investigated this recommendation by speaking to Baer and Carcamo, checking Baer's cell phone records to confirm a call was made to Bullard's cell phone, and reviewing Bullard's personnel file.  McCauley with human resources met with Baer and Bryner about the recommendation for Bullard's discipline.  McCauley reviewed Bullard's personnel file and observed that Bullard "had way more discipline than any salaried employee I'd ever seen." (Dk. 69-5, Dep. p. 58).  McCauley also interviewed Carcamo about the incident.

On Monday, September 17, 2007, Bryner escorted Bullard to human resources where they met with McCauley.  McCauley asked Bullard to provide them with more information over the Johnson workmanship case.  Before McCauley or Bryner, Bullard did not question or allege that Johnson's race was involved in Baer's treatment of him.  Following this conversation, Bullard stepped out of the room.  Based on his investigation Bryner proposed that Bullard be terminated.  There was a consensus between Bryner and human resources over Bullard's termination.  Bullard was brought back into room and informed by Bryner and McCauley that she was being terminated for mishandling the Johnson discipline.  (Dk. 69-2, Bullard Dep. p. 89). According to Bryner, Bullard was discharged for all the incidents found in personnel filed related to her "ability to hold people accountable for their actions and address performance issues" and for the Johnson incident that

13

demonstrated again her inability to confront performance issues consistent with her supervisor's wishes.  (Dk. 69-4, Dep. pp. 182, 302-303).

Bullard received a letter dated September 18, 2007, and signed by Baer that stated in part, "This letter informs you of your termination from the Goodyear Tire & Rubber Company for violation of your Last Chance Letter dated July 23, 2004."  (Dk. 93-14).  The letter also informed her of the "right to request a review board of senior managers to examine this decision."  *Id.*

Pursuant to Goodyear policy, a decision to terminate a manager is reviewed by three members of plant management who were not involved in the initial decision to terminate and who are designated as the review board.  This board has the authority to affirm the termination or impose lesser discipline, including a return to work subject to the terms of a last chance letter.  A review board evaluated Bullard's termination, and Bullard was permitted to address the board with an explanation of her actions and other relevant information.  Bullard did not tell the review board that Baer was discriminating against Johnson due to his race.  The board affirmed the termination.  After human resources manager, Jay Greathouse, told Bullard of the decision, Bullard said she believed she had been fired due to her gender and close relationship with the union.  This was the first time that Bullard had said anything about her gender being the cause of this firing.

14

Bullard admitted in her deposition that this was the fourth time she had appeared before a review board in order to keep her job and that she did not know of any other area manager who had been before a review board as many times as she had.

Bullard testified that on the morning of her termination on September 15, she discussed with two other area managers, Dustin Curtis and Phil Rogers, whether Johnson was being disciplined due to his race. Bullard did not mention this to anyone else and did not believe that Baer had known of her discussion with Curtis and Rogers.  Bullard filed an EEOC complaint on March 24, 2008, alleging discrimination on the basis of gender and age and retaliation for opposing racial discrimination and violations of the NLRA.  The EEOC issued a right to sue letter on December 1, 2008.

Bullard's replacement for area manager was Wayne Copp, a white male who was 39 years old at the time.

<u>Bullard's Complaints</u>

Goodyear uses a zero tolerance non-discrimination policy that includes procedures for employees to report violations.  Bullard had been trained on this policy and knew the procedure for reporting violations. Bullard never used the Goodyear Topeka complaint hotline, but she did make a complaint in 2004 to the Akron complaint hotline of gender discrimination against a supervisor, Mike Burns.  This complaint was made

15

during her 14-day suspension, and she alleged that Burns had accused her of intentionally botching a drug test, he had singled her out on one occasion for wearing jeans, he used a demeaning tone of voice and sarcasm in dealing with her, and he criticized her as a terrible manager.  Burns never made to her inappropriate comments about age or gender, and Bullard was unaware of Burns having made any such comments.  Burns disciplined Bullard only once resulting in the last chance letter of 2004.

As far as Bullard's other complaints of discrimination, she testified to the following.  Sometime before 2000, other employees had told her that a supervisor, John Cowan, had been lying about her and saying that women should not be in management.  In 2004 or 2005, Pfeiffer told Bullard that she should retire and find other work, that he believed she was a poor manager and that he would get her a job anywhere else in the plant but his area.  In 2005, Bullard complained to her supervisor, Willie Collins, that she had heard from others that two area managers had made "slurs" regarding her gender and age.  Bullard also testified that between 2000 and 2006 when Collins retired, he had made sexually degrading comments about women and even made a comment directly to her.  Bullard never made a complaint about Collins' behavior.  In 2006, Bullard observed another management person, John Blocker, make physical gestures suggesting he was sexually attracted to a female replacement worker.

16

Bullard testified to more complaints of prior discrimination. During the union strike in 2006, Pfeiffer accused Bullard of being a union spy.  Over a year before her termination, Bullard overheard Pfeiffer refer to someone as a "stupid old bitch."  Sometime after the strike, Bullard had told Carcamo that because of her gender she was not respected by management, but she did not consider her comment to be a complaint that Carcamo should process.  More than one year before her termination, Bullard had complained to JT Johnson who was a superior and another area manager, Dustin Curtis, that older managers were being replaced by younger managers.  Bullard told Jim Gilliam, a value stream manger, in early 2006, of her problems with male managers, in particular, their close supervision of her and setting her up for failure.  Bullard felt reassured by Gilliam's response that "someone was finally around" who would value her worth and respect her.

Whitley, McCauley, Bryner and Baer never made inappropriate comments about Bullard's gender or age.  Bullard testified that Baer did not seek her opinion about business issues, acted aloof, and showed disdain for her in his body language and facial expressions.  Bullard believed her gender was a problem to Baer based on his reactions to her.  Bullard also said that she saw Baer interact with other managers and didn't witness him using the same body language and facial expressions with them.  In August of 2007,

17

Baer approached Bullard about moving to second shift, but Bullard objected and no change in shifts occurred.  While she never submitted a written complaint of Baer's treatment, she did complain to Alan Tipton, a value stream manager, that Baer was not available, did not want to learn, would not talk with her directly, and did not grasp the business.  Bullard made the same complaints to other area managers and Carcamo.

Other Evidence

Based on what a current employee had told her, Bullard testified that a week after her termination a white associate, Raymond Evans, ran two biased tires up on the wrong assemblies, and Evans was not disciplined nor was his white male area manager, Wayne Cope, for not disciplining Evans.  The defendant subsequently provided the affidavit of Cope who identified Evans as an African-American male associate and explained that Evans was not at fault for the mistake because someone else had improperly labeled the bladder assembly.  Bullard testified that other employees had inserted tires incorrectly and were not disciplined, but she could not identify any specific instances other than Evans.

**SUMMARY JUDGMENT STANDARDS**

Rule 56 authorizes judgment without trial "if the pleadings, the discovery and disclosure materials on file, and any affidavits show that there is no genuine issue as to any material fact and that the movant is entitled to

18

judgment as a matter of law."  Fed. R. Civ. P. 56(c)(2).  Substantive law

governs the elements of a given claim or defense and reveals what issues

are to be determined and what facts are material.  *See Anderson v. Liberty

Lobby, Inc.*, 477 U.S. 242, 248 (1986).  A material fact is one which would

affect the outcome of the claim or defense under the governing law.  *Id.*

On summary judgment, the initial burden is with the movant to

point out the portions of the record which show that the movant is entitled

to judgment as a matter of law.  *Thomas v. Wichita Coca–Cola Bottling Co.*,

968 F.2d 1022, 1024 (10th Cir. 1992), *cert. denied*, 506 U.S. 1013 (1992),

Instead of disproving a claim or defense, the movant need only show "a lack

of evidence" on an essential element.  *Adler v. Wal–Mart Stores, Inc.*, 144

F.3d 664, 671 (10th Cir. 1998).  If the movant meets that burden, the non-

movant must come forward with specific facts based on admissible evidence

from which a rational fact finder could find in the non-movant's favor.  *Id*.

The non-movant must show more than some "metaphysical doubt" based on

"evidence" and not "speculation, conjecture or surmise."  *Matsushita Elec.

Indust. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986)*; Bones v.

Honeywell Intern.*, 366 F.3d 869, 875 (10th Cir. 2004).  The essential

inquiry is "whether the evidence presents a sufficient disagreement to

require submission to the jury or whether the evidence is so one-sided that

one party must prevail as a matter of law."  *Anderson v. Liberty Lobby*, 477

U.S. at 251-52.  However, "[w]here the record taken as a whole could not lead a rational trier of fact to find for the nonmoving party, there is no 'genuine issue for trial.'"  *Matsushita*, 475 U.S. at 587; *see Pinkerton v. Colorado Dept. of Transp.*, 563 F.3d 1052, 1058 (10th Cir. 2009).

In ruling on a motion for summary judgment, the nonmoving party's evidence "is to be believed, and all justifiable inferences are to be drawn in [that party's] favor."  *Anderson*, 477 U.S. at 255.  Facts and reasonable inferences therefrom are to be viewed in the light most favorable to the nonmoving party.  *MacKenzie v. City and County of Denver*, 414 F.3d 1266, 1273 (10th Cir. 2005).  At this stage, "[c]redibility determinations, the weighing of the evidence, and the drawing of legitimate inferences from the facts are jury functions, not those of a judge. . . ."  *Anderson*, 477 U.S. at 255.

## TIMELY TITLE VII CHARGES

Both Title VII and the ADEA require a claimant to "file a timely administrative claim within 300 days of the challenged discriminatory action."  *Haynes v. Level 3 Communications, LLC*, 456 F.3d 1215, 1222 (10th Cir. 2006), *cert. denied*, 549 U.S. 1252 (2007).  Because the claimant filed her administrative complaint on March 24, 2008, "the discriminatory actions on which she bases her claims must have occurred on or after" May 29, 2007.  *See id.*  "'[D]iscrete discriminatory acts are not actionable if time

barred, even when they are related to acts alleged in timely filed charges.

Each discrete discriminatory act starts a new [300-day] clock for filing

charges alleging that act.'"   *Id.* (quoting *Nat'l R.R. Passenger Corp. v.*

*Morgan*, 536 U.S. 101, 113 (2002)).   The Tenth Circuit has observed:

> The very precision of this requirement-not a year, not six months, on
> the state law statute of limitations for comparable causes of action-
> bespeaks Congress's concern.   Title VII is not intended to allow
> employees to dredge up old grievances; they must promptly report
> and take action on discriminatory acts when they occur.   Unlitigated
> bygones are bygones.

*Duncan v. Manager, Dept. of Safety, City and County of Denver*, 397 F.3d

1300, 1308 (10th Cir. 2005).

As reflected in the final pretrial order, the plaintiff asserts for the

element of adverse employment action to each of her theories of recovery

that she "was fired."   (Dk. 62, pp. 12-16).   While she characterizes her

action as "brought to remedy discrimination on the basis of age and sex in

the terms, conditions and privileges of employment and to remedy

retaliation against an employee for activity protected under Title VII," (Dk.

62, p. 9), the plaintiff's contentions fail to identify and denominate a claim

based on any other adverse employment action than her termination.   The

court reads the final pretrial order as the plaintiff seeking relief only for her

termination.   The defendant does not challenge the timeliness of the

plaintiff's administrative complaint concerning her termination in September

of 2007.

**RETALIATION**

"The 'opposition clause,' . . ., provides that an employer may not retaliate against an employee 'because he has opposed any practice made an unlawful employment practice' by Title VII. *Vaughn v. Epworth Villa*, 537 F.3d 1147, 1151 (10th Cir. 2008) (citing 42 U.S.C.A. § 2000e-3(a)), *cert. denied*, 129 S. Ct. 1528 (2009). Because the plaintiff is relying on indirect or circumstantial evidence and not on direct evidence, the court examines the claim under the burden-shifting framework set forth in *McDonnell Douglas Corp. v. Green*, 411 U.S. 792 (1973). *Pinkerton v. Colorado Dept. of Transp.*, 563 F.3d at 1064. This framework imposes on the plaintiff the initial burden of establishing the following prima facie case of retaliation: "(1) that [s]he engaged in protected activity; (2) that a reasonable employee would have found the challenged action materially adverse, and (3) that a causal connection existed between the protected activity and the materially adverse action." *Proctor v. United Parcel* Service, 502 F.3d 1200, 1208 (10th Cir. 2007). Should the plaintiff come forward with this prima facie case, the defendant employer must offer a nondiscriminatory reason for the adverse action. *Piercy v. Maketa*, 480 F.3d 1192, 1198 (10th Cir. 2007). If the defendant provides this legitimate reason for termination, then the burden shifts back to the plaintiff to show the defendant's "reason is a "pretext masking discriminatory animus.'" *Proctor*, 502 F.3d at 1208 (quoting *Piercy*,

480 F.3d at 1198).  The *McDonnell Douglas* framework applies to both discrimination and retaliation claims relying on indirect evidence.  *Mathews v. Denver Newspaper Agency LLP*, ---F.3d---, 2011 WL 1901341 (10th Cir. May 17, 2011).

<u>Prima Facie Elements of Protected Activity and Causal Connection</u>

"'Protected activity' consists of activity opposing or complaining about discrimination by the employer based on race, color, religion, gender or national origin."  *McDonald-Cuba v. Santa Fe Protective Services, Inc.*, 644 F.3d 1096, 1102 (10th Cir. 2011).  "Protected opposition can range from filing formal charges to voicing informal complaints to superiors."  *Hertz v. Luzenac America, Inc.*, 370 F.3d 1014, 1015 (10th Cir. 2004).  To be protected, the opposition must be against a "'practice made an unlawful employment practice by Title VII.'"  *Zokari v. Gates*, 561 F.3d 1076, 1081 (10th Cir. 2009) (quoting *Petersen v. Utah Dept. of Corrections*, 301 F.3d 1182, 1188 (10th Cir. 2002) ("Title VII does not prohibit all distasteful practices by employers.")).  "Although no magic words are required, to qualify as protected opposition, the employee must convey to the employer his or her concern that the employer has engaged in [an unlawful] practice."  *Hinds v. Sprint/United Management Co.*, 523 F.3d 1187, 1203 (10th Cir. 2008) (citing in part *Anderson v. Academy School Dist. 20*, 122 Fed. Appx. 912, 916 (10th Cir. 2004) ("[A] vague reference to discrimination and

23

harassment without any indication that this misconduct was motivated by [age] does not constitute protected activity and will not support a retaliation claim.")).  "General complaints about company management and one's own negative performance evaluation will not suffice."  *Id.*  (citing in part *Coutu v. Martin County Bd. of County Com'rs*, 47 F.3d 1068, 1074 (11th Cir. 1995) ("holding that employee's grievance about performance evaluation, which was not based on unlawful discrimination did not constitute statutorily protected activity.")).

For a plaintiff "[t]o establish the requisite causal connection between his protected conduct and termination, . . . [he] must show that . . . [the employer] was motivated to terminate his employment by a desire to retaliate for his protected activity."  *Hinds*, 523 F.3d at 1203.  "As a prerequisite to this showing, . . . [the plaintiff] must first come forward with evidence from which a reasonable factfinder could conclude that those who decided to fire him had knowledge of his protected activity."  *Id.*  If all the employer knows is that the plaintiff employee is opposing a supervisor's treatment of another employee "simply because the treatment violated established practices and was unfair to" the other employee, then the employer would not know that the plaintiff employee was "opposing a practice made an unlawful employment practice by Title VII."  *Peterson*, 301 F.3d at 1188.  To be prohibited retaliation, the retaliating supervisor must

know the plaintiff's opposition "was motivated by a belief that . . . [the supervisor] was engaging in racial . . . discrimination." *Id*. at 1189. Moreover, the decision maker's knowledge of protected activity must be shown in the first instance because "proximity between a specific [protected activity] and the alleged retaliatory act is meaningless unless those who caused the alleged retaliatory act to occur are shown to be aware of the specific activity." *Hysten v. Burlington Northern and Santa Fe Ry. Co.*, 296 F.3d 1177, 1184 (10th Cir. 2002).

"A causal connection between a protected action and a subsequent adverse action can be shown through evidence of circumstances that justify an inference of retaliatory motive, such as protected conduct closely followed by adverse action." *E.E.O.C. v. C.R. England, Inc.*, 644 F.3d 1028, 1051 (10th Cir. 2011) (internal quotation marks and citations omitted). The Tenth Circuit has refused to recognize a presumption of causation in cases where the adverse actions were taken as few as three months after the protected activity. *Id*. (more than one year) (citing *Proctor v. United Parcel Service*, 502 F.3d at 1208 (four months), and *Piercy v. Maketa*, 480 F.3d at 1198 (three months); *see Hinds*, 523 F.3d at 1204 ("[W]e have held that a one-and-a-half month period may suffice to establish causation on a prima facie basis, but a three-month period, standing alone, will not suffice." (citation omitted)). In *Piercy*, the Tenth

Circuit observed:

> [T]he passage of time does not necessarily bar a plaintiff's retaliation claim if *additional* evidence establishes the retaliatory motive. Other evidence in the record could establish an adverse employment action taken after a lengthy period of time was still in response to the earlier, protected activity--temporal remoteness is not necessarily dispositive. While "[w]e have recognized that protected conduct closely followed by adverse action may justify an inference of retaliatory motive," nonetheless, "the phrase 'closely followed' must not be read too restrictively where the pattern of retaliatory conduct begins soon after the [protected action] and only culminates later in actual discharge." *Marx v. Schnuck Mkts., Inc.*, 76 F.3d 324, 329 (10th Cir. 1996).

480 F.3d at 1198-99. A plaintiff will not survive summary judgment on a Title VII retaliation claim "with general claims of retaliation but no specifics." *Petersen v. Utah Dept. of Corrections*, 301 F.3d at 1191.

What the plaintiff asserts as protected activity falls within two general categories: (1) her informal and formal complaints of workplace discrimination to managers and supervisors, and (2) her opposition to Baer's efforts to terminate an African-American employee. Under the first category, the plaintiff has testified to a number of conversations with co-workers in which she expressed and discussed her opinions on whether certain policies and practices affecting her were discriminatory. These informal conversations with co-workers are not protected activity, because they were not voiced to supervisors or superiors. *See Somoza v. University of Denver*, 513 F.3d 1206, 1213-14 (10th Cir. 2008). As far as specific complaints to specific supervisors or management, the plaintiff's evidence

26

focuses on a hot line call she made in 2004.  She testified to calling the Akron (home office) complaint hotline in 2004 and to complaining that because of her gender, her supervisor, Mike Burns, had harassed her, singled her out for discipline and treated her differently.  The plaintiff admitted that Burns actually disciplined her only the one time for botching the drug test in 2004, and that this resulted in her 14-day suspension and the last chance letter.  The plaintiff testified that during her suspension she made the hot line call and also complained that Burns had singled her out for wearing jeans on one occasion and made her go home and change, used a sarcastic and demeaning tone of voice with her, and told her that she was a terrible manager.  The plaintiff testified that she was never asked to sign anything in connection with this complaint and that she was told in a meeting that her complaint was not found worthy of being pursued.

The plaintiff's testimony supports treating the hot line call as protected activity, but it occurred more than three years before her termination and so lacks any temporal proximity.  The plaintiff's brief does not argue and fashion a presentation to show a pattern of retaliatory conduct following her complaint in 2004 that culminated in her termination. The plaintiff's termination letter in 2007 references the 2004 Last Chance Letter, but the court fails to see a causal connection to the hotline call from this reference alone.  The plaintiff summarily contends that the 2004 Last

27

Chance Letter was unlawful gender discrimination on its face, because she was disciplined for not observing a male employee give a urine sample. This contention mischaracterizes the evidence of record. The plaintiff testified she was told at the time that she had botched the drug test in not having a male member of management witness the urine sample and that she understood management regarded the test as unreliable because she had allowed a male union representative accompany the employee when the urine sample was taken. There is no evidence that the defendant required or disciplined the plaintiff for not personally witnessing a male employee's urine sample. The plaintiff cannot rely on this untenable argument to establish a causal connection.

The plaintiff has testified to making informal complaints of discrimination to supervisors and superiors between 2004 and 2007. This includes a 2005 complaint to her supervisor Collins that she had heard from others that two of her co-workers were making discriminatory comments about her. The plaintiff testified to overhearing and witnessing discriminatory comments and actions. That the plaintiff heard or saw such things is not protected opposition in itself, and she did not testify to making any specific complaints to supervisors based on them. The plaintiff admitted she did not regard her comments to Gilliam in early 2006 and Carcamo in early 2007 to be complaints that she expected either of them to act upon.

28

Finally, more than one year before her termination, she complained to supervisor Johnson about older managers being replaced by younger ones. Assuming some or all of these complaints qualify as protected opposition, they lack temporal proximity and display no pattern of retaliatory conduct[4] on which to support a prima facie showing of a causal connection.

This leaves the plaintiff's opposition to Baer's disciplinary handling of Johnson.  There is no question of temporal proximity between the plaintiff's termination and her efforts to dissuade Baer from terminating Johnson for the workmanship error.  There is no evidence, however, that prior to her termination the plaintiff complained to or voiced any concern to a supervisor that she was opposing Baer's discipline of Johnson because she believed Baer was being racially discriminatory.  While those deciding to terminate the plaintiff knew she opposed Baer's treatment of Johnson, the plaintiff is unable to show that they knew the plaintiff was "opposing a practice made an unlawful employment practice by Title VII." *Peterson*, 301 F.3d at 1188.  That the plaintiff was suspicious of Baer's motives and told her co-workers about her suspicions are not protected activities shown to be

---

[4]The Tenth Circuit has "recognized that a pattern of adverse personnel actions over a period of weeks or months may demonstrate an employer's retaliatory animus notwithstanding the absence of close temporal activity between the employee's initial protected activity and the employer's ultimate decision to terminate the employee." *Steele v. Kroenke Sports Enterprises, L.L.C.*, 264 Fed. Appx. 735, 746 (10th Cir. 2008) (citing *Marx v. Schnuck Markets, Inc.*, 76 F.3d 324, 329 (10th Cir.), *cert. denied*, 515 U.S. 1019 (1996)).

within the knowledge of the decision makers at the time of her termination.

Nor is the employer's knowledge of protected activity shown simply from the

fact that the employer knew Johnson was African American.  Finally, the

plaintiff cites the recent Supreme Court decision of *Staub v. Proctor Hospital*,

562 U.S.---, 131 S. Ct. 1186 (2011), and argues that Baer's motive should

be attributed to the defendant.  What the plaintiff fails to present is that

Baer had knowledge of the plaintiff's protected activity prior to his

recommendation to Bryner that the plaintiff be disciplined.  Because the

plaintiff is unable to make a prima facie case of retaliation, the defendant is

entitled to summary judgment on this claim.

## GENDER DISCRIMINATION

Title VII prohibits an employer from "discriminat[ing] against

any individual with respect to h[er] compensation, terms, conditions, or

privileges of employment, because of such individual's . . . sex."  42 U.S.C. §

2000e-2(a)(1).  Pointing to no direct evidence of gender discrimination, the

plaintiff's claim is analyzed under the burden-shifting framework of

*McDonnell Douglas* discussed above.  On this claim, the plaintiff must

establish a prima facie case by showing that she:  "(1) belongs to a

protected class; (2) was qualified for her position; (3) was discharged

despite her qualifications; and (4) was terminated under circumstances

which give rise to an inference of unlawful discrimination."  *Swackhammer v.*

*Sprint/United Management Co.*, 493 F.3d 1160, 1166 & n. 8 (10th Cir. 2007) (internal quotation marks and citation omitted).  In other Tenth Circuit cases, the second element is stated as "her job performance was satisfactory."  *Kline v. Utah Anti-Discrimination and Labor Div.*, 418 Fed. Appx. 774, 783 (10th Cir. 2011) (citing *Goodwin v. General Motors Corp.*, 275 F.3d 1005, 1012 (10th Cir.), *cert. denied*, 537 U.S. 941 (2002)).  Other Tenth Circuit cases also articulate the fourth element as "her position was not eliminated after her discharge."  *Adamson v. Multi Community Diversified Services, Inc.*, 514 F.3d 1136, 1150 (10th Cir. 2008).  The panel in *Adamson* panel recognized:

> The standard is flexible, however, and may vary depending on the context of the claim and the nature of the adverse employment action alleged.  *Plotke*, [405 F.3d] at 1099 (citing *McDonnell Douglas*).  Thus, the fact a plaintiff's job was or was not eliminated after her discharge is not necessarily conclusive of her prima facie case.  "The critical prima facie inquiry in all cases is whether the plaintiff has demonstrated that the adverse employment action occurred 'under circumstances which give rise to an inference of unlawful discrimination.'"  *Id.* at 1100 . . . .

514 F.3d at 1150-51.

<u>Prima Facie--Second Element</u>

The defendant argues the plaintiff cannot prove this element based upon her unsatisfactory job evaluations, her recent placement on a performance improvement plan, employment history replete with numerous disciplinary incidents and prior terminations, and her persistent problems

with attendance, insubordination and failure to discipline employees.  The plaintiff points to the fact that she had been employed there for more than thirty years, her own opinion of her work performance, and the extended supervisory responsibilities she held.  As for the defendant's opinion about her job performance, the plaintiff contends this should not be considered at the prima facie stage.

The Tenth Circuit has "held that a defendant cannot defeat a plaintiff's prima facie case by articulating the reasons for the adverse employment action because the plaintiff in such a situation would be denied the opportunity to show that the reasons advanced by the defendant were pretextual." *E.E.O.C. v. Horizon/CMS Healthcare Corp.*, 220 F.3d 1184, 1193 (10th Cir. 2000) (citing *MacDonald v. Eastern Wyoming Mental Health Center*, 941 F.2d 1115, 1119-20 (10th Cir. 1991)).  "[A] plaintiff is only required to raise an *inference of discrimination*, not dispel the non-discriminatory reasons subsequently proffered by the defendant." *Orr v. City of Albuquerque*, 417 F.3d 1144, 1149 (10th Cir. 2005).  "A defendant's evidence regarding an employee's work performance should not be considered when determining whether the employee has made a prima facie case of employment discrimination." *Ellison v. Sandia Nat'l. Laboratories*, 60 Fed. Appx. 203, 205, 2003 WL 714849 at *2 (10th Cir.) (citing in part *MacDonald*, 941 F.2d at 1119-20 and *Horizon/CMS Healthcare Corp.*, 220

32

F.3d at 1192-93), *cert. denied*, 540 U.S. 880 (2003).  "In analyzing

Plaintiff's prima facie case, it is important not to conflate their claim of

discrimination with Defendants' proffered explanation."  *Orr*, 417 F.3d at

1149 (citation omitted).  The Tenth Circuit has held in such circumstances:

> that a plaintiff may meet the second element of "a prima facie case of
> discrimination in a discharge case by credible evidence that she
> continued to possess the objective qualifications she held when she
> was hired, or by her own testimony that her work was satisfactory,
> even when disputed by her employer, or by evidence that she held her
> position for a significant period of time."

*Bolton v. Sprint/United Management Co.*, 220 Fed. Appx. 761, 767, 2007 WL

666339 at *4 (10th Cir. 2007) (quoting *MacDonald*, 941 F.2d at 1121

(citations omitted)); see *Bowdish v. Federal Express Corp.*, 699 F. Supp. 2d

1306, 1317-18 (W.D. Okla. 2010).  Based on her lengthy tenure at

Goodyear and her own testimony about her work performance, the plaintiff

has satisfied this second element of her prima facie case.  *See Beaird v.*

*Seagate Technology, Inc.*, 145 F.3d 1159, 1166 n.3 (10th Cir.), *cert. denied*,

525 U.S. 1054 (1998).

<u>Prima Facie--Fourth Element</u>

The defendant denies an inference of discrimination arises from

the defendant's lower salary since the highest paid area manager was a

woman and no other area manager had a disciplinary record as poor as the

plaintiff's.  The defendant argues the plaintiff has no evidence that she was

disciplined more harshly than a male area manager with her employment

33

record.  The defendant disputes the plaintiff has evidence to sustain the fourth element.  The plaintiff points to her lower salary than male managers with less experience, her greater supervisory responsibilities, and the defendant's replacement of her with a male.

Tenth Circuit authority does not support the defendant's construction of the fourth element.  In a discriminatory discharge case, a plaintiff can satisfy the fourth element "simply by showing that the job was not eliminated."  *Ortiz v. Norton*, 254 F.3d 889, 895 (10th Cir. 2001) (citations omitted).  "'The firing of a qualified minority employee raises the inference of discrimination because it is facially illogical for an employer to randomly fire an otherwise qualified employee and thereby incur the considerable expense and loss of productivity associated with hiring and training a replacement.'"  *Id.* (quoting *Perry v. Woodward*, 199 F.3d 1136, 1140 (10th Cir. 1999), *cert. denied*, 529 U.S. 1110 (2000)).  "[C]omparison to a person outside of the protected class in the fourth prong of the prima facie case is unnecessary to create an inference of discriminatory discharge." *Kendrick v. Penske Transp. Services, Inc.*, 220 F.3d 1220, 1229 (10th Cir. 2000) (citation omitted).  For the fourth element in this discriminatory discharge case, it is enough that the plaintiff was replaced with another employee and that the defendant chose to replace her with a male is simply additional evidence in support of her prima facie case.  *Kendrick*, 220 F.3d at

34

1229 n.8.  The plaintiff has met her burden of producing a prima facie case of discriminatory discharge on the basis of gender by a preponderance of evidence.

Goodyear's Non-discriminatory Reason

The burden now shifts to Goodyear to come forward with a legitimate, non-discriminatory reason for Bullard's discharge.  *Argo v. Blue Cross and Blue Shield of Kansas, Inc.*, 452 F.3d 1193, 1202 (10th Cir. 2006).  Goodyear has satisfied this light burden by providing evidence that Bullard disregarded her supervisor's directives and disciplined Johnson without waiting for the supervisor's final review and decision on Johnson's discipline.  Based on documentary evidence and on the testimony of different Goodyear managers,  Bullard was terminated for mishandling Johnson's discipline in light of her 2004 Last Chance Letter Agreement and her extensive history of personnel and disciplinary problems.  For the reasons stated earlier, the plaintiff's characterization of the 2004 agreement as gender discrimination is summarily rejected.  Her violation of the drug testing policy was not due to her failure to witness personally a male employee's urine sample test but was for her failure to request a male manager to be present and for allowing a male union representative to be present.  There is no traction to the plaintiff's argument that the grounds of this discipline amount to gender discrimination.

35

## Pretext

The burden now shifts back to the plaintiff to demonstrate that

Goodyear's proffered reason for termination is a pretext for gender

discrimination.  Bullard makes this showing "by presenting evidence of 'such

weaknesses, implausibilities, inconsistencies, incoherencies, or

contradictions in the employer's proffered legitimate reasons for its action

that a reasonable factfinder could rationally find them unworthy of credence

and hence infer that the employer did not act for the asserted non-

discriminatory reasons.'"  *McDonald-Cuba v. Santa Fe Protective Services,*

*Inc.*, 644 F.3d at 1102 (quoting *Jaramillo v. Colorado Judicial Dept.*, 427

F.3d 1303, 1308 (10th Cir. 2005)); *see also E.E.O.C. v. C.R. England, Inc.*,

644 F.3d at 1039 ("A plaintiff demonstrates pretext by showing either that a

discriminatory reason more likely motivated the employer or that the

employer's proffered explanation is unworthy of credence." (citations and

internal quotation marks omitted)). The Tenth Circuit has summarized the

law relevant to this inquiry:

> "In determining whether the proffered reason for a decision was
> pretextual, we examine the facts as they appear to the person making
> the decision," *Zamora [v. Elite Logistics, Inc.*, 478 F.3d [1160] at 1166
> [(10th Cir. 2007)]* (quoting *Watts v. City of Norman*, 270 F.3d 1288,
> 1295 (10th Cir. 2001)); we do not look to the plaintiff's subjective
> evaluation of the situation, *see McKnight v. Kimberly Clark Corp.*, 149
> F.3d 1125, 1130 (10th Cir. 1998). Regarding the supervisor's belief
> that he had inappropriately "burned up" his hours, Mr. Watson had
> told the driver manager that he had run out of hours. When asked why
> this was the case, Mr. Watson did not explain and instead simply

36

refused the load. Moreover, regardless of whether Mr. Watson actually misallocated his hours, we are only concerned with whether the employer held a good-faith belief that he had done so; the evidence before us demonstrates that it did. *See Sorbo v. United Parcel Serv.*, 432 F.3d 1169, 1178 (10th Cir. 2005) (indicating that the relevant inquiry "concerns the belief of the employer that the employee engaged in misconduct, not whether the actual facts, as shown by evidence extrinsic to the employer's assessment, may have been otherwise."). In the end, Mr. Watson has not put forth any evidence that undermines the sincerity of C.R. England's stated justification—that is, he has not demonstrated it is "unworthy of belief." *Stover v. Martinez*, 382 F.3d 1064, 1071 (10th Cir.2004).

*C.R. England*, 644 F.3d at 1028.  "Pretext may also be shown by providing direct evidence that the proffered rationale is false, or that the plaintiff was treated differently from similarly-situated employees." *Crowe v. ADT Sec. Services, Inc.*, ---F.3d---, 2011 WL 1532536 at *6 (10th Cir. 2011) (citing *Swackhammer*, 493 F.3d at 1167-68).  "Evidence of pretext may include prior treatment of plaintiff; the employer's policy and practice regarding minority employment (including statistical data); disturbing procedural irregularities (e.g., falsifying or manipulating . . . criteria); and the use of subjective criteria." *Jaramillo v. Colorado Judicial Dept.*, 427 F.3d at 1308 (internal quotation marks and citations omitted).  For analyzing pretext, "[t]he relevant inquiry is not whether [the defendant's] proffered reasons were wise, fair or correct, but whether [it] honestly believed those reasons and acted in good faith upon those beliefs." *Exum v. U.S. Olympic Comm.*, 389 F.3d 1130, 1138 (10th Cir. 2004) (quotation omitted).  On the other hand, "there may be circumstances in which a claimed business judgment is

37

so idiosyncratic or questionable that a factfinder could reasonably find that it is a pretext for illegal discrimination." *Beaird v. Seagate Tech.*, 145 F.3d at 1169.  In the context of a summary judgment motion, the court is not being asked "to conduct a mini-trial to determine the defendant's true state of mind," and it should deny the motion "as long as the plaintiff has presented evidence of pretext . . . upon which a jury could infer discriminatory motive." *Pinkerton*, 563 F.3d at 1066 (internal quotation marks and citations omitted).

 The plaintiff here principally incorporates her arguments of pretext made under her retaliation claim while reiterating the propositions that the last chance letter was gender discrimination in itself, that she has shown her actions were not insubordinate, that the defendant knew her actions were not insubordinate, and that she proceeded with Johnson's discipline because Baer had not given her any contrary directions.  Her incorporated arguments of pretext challenge the reasonableness of Baer's suggested discipline of Johnson, offer her opinion that she was disciplined differently from male managers, note that her letter of termination does not mention insubordination, restate her evidence and arguments against a finding that she had been insubordinate in handling Johnson's discipline. The court is convinced that the plaintiff has not come forward with evidence of pretext from which a jury could infer a discriminatory intent behind

Goodyear's termination of her.

The plaintiff does not explain how Baer's preference for more severe discipline for Johnson's workmanship error constitutes any evidence of pretext in the defendant's decision to terminate her.  The plaintiff summarily argues that a comparable workmanship incident occurred just a week after her termination with neither the associate nor the supervisor being disciplined.  "[E]vidence of less severe discipline for other employees that are not members of the same protected group who violated work rules of comparable seriousness can establish pretext." *Piercy v. Maketa*, 480 F.3d at 1202.  The plaintiff, however, offers no admissible evidence to show this is disparate discipline.  The defendant does offer evidence that distinguishes the workmanship error in the latter incident based on the lack of comparable fault.  As found in her affidavit, the plaintiff also makes several conclusory assertions that to the "best of her knowledge" she was treated less favorably than male managers in being disciplined for attendance or tardiness and in being questioned about her disciplinary decisions on associates.  This opinion testimony is so qualified and so lacking in details and foundation that it fails to establish relevant disparate discipline as to give rise to a genuine issue of material fact and undermine the good faith beliefs of those supervisors making the decision to terminate Bullard. *See Salguero v. City of Clovis*, 366 F.3d 1168, 1178 (10th Cir. 2004).

The plaintiff suggests pretext in the defendant asserting insubordination as a reason for her termination before the EEOC but failing to mention "insubordination" in her termination letter.  An employer shifting from one justification to another can be evidence that the offered justification is incoherent or unworthy of belief.  The termination letter is not inherently inconsistent with what Bullard was told at the time of her termination or with what Goodyear argued before the EEOC.  Indeed, the termination letter merely states the conclusion that Bullard violated the Last Chance Letter without describing the factual basis for that conclusion.  The record shows that Bullard's mishandling of Johnson's discipline in not waiting for and complying with Baer's directives was what Goodyear regarded as insubordination, as her violation of the Last Chance Letter, and as the driving reason for Bullard's termination.

In Bullard's opinion, the issuance of the 2004 Last Chance Letter amounts to gender discrimination that taints the defendant's reliance on it in 2007.  The court has already discussed and rejected the plaintiff's untenable logic behind this position.  The 2004 incident is simply too remote in time to serve as evidence of pretext for the termination in 2007.  Additionally, the 2004 discipline and resulting letter were grounded on a number of circumstances, involved different supervisors, and were separated by the defendant's further investment into rehabilitating and improving the

40

plaintiff's performance.

In attempting to meet her burden of proving pretext, Bullard devotes most of her effort to disputing that she was insubordinate to Baer. Her effort is circumscribed by the general rule that "'an employer's exercise of erroneous or even illogical business judgment does not constitute pretext.'" *C.R. England, Inc.*, 644 F.3d at 1044 (quoting *Reynolds v. School Dist. No. 1, Denver, Colo.*, 69 F.3d 1523, 1535 (10th Cir. 1995)).  A court is "not to act as a super personnel department that second guesses employers' business judgments." *Simms v. Oklahoma ex rel. Dep't of Mental Health and Substance Abuse Services*, 165 F.3d 1321, 1330 (10th Cir.) (quotation omitted), *cert. denied*, 528 U.S. 815 (1999).  Bullard must show the defendant's business judgment here was so questionable, idiosyncratic, or indefensible that a factfinder could reasonably find it to be a pretext for illegal discrimination.  Bullard's arguments and evidence fall far short of this necessary showing.

On September 13 around 4:27 p.m., Scott Baer called Bullard on her cell phone while Bullard was on her way home.  Bullard's own notes from the call show:

> Scott said he would review the records because he was still leaning towards a step V.  I again repeated my reasons why a Step IV would be more appropriate.  Scott said he would get back with me after reviewing the records.  I told him to get back with me anytime.  I did not hear back from Scott.

(Dk. 93-11, p. 2).  Bullard did not hear from Baer that evening, and she did not wait to hear from Baer the next morning.  Instead, at 6:45 a.m., Bullard met with Johnson and the union steward and imposed the discipline that she had been recommending and her supervisor had been questioning as insufficient.  At 7:20 a.m., Baer emailed Bullard telling her to impose the more severe discipline, as he was unaware of what Bullard had done less than an hour earlier.  Bullard admits Baer never directed or authorized her to go forward with her preferred discipline if he did not call her that evening. Bullard defends her actions and assumption based on the need to discipline within a required period, but there was an exception to this time requirement that Bullard also chose not to exercise.  All of these circumstances were investigated by Baer's supervisor, Bryner, and reviewed by McCauley with human resources.  McCauley and Bryner interviewed Bullard about this matter, and Bryner recommended termination and McCauley approved it after reviewing Bullard's personnel file.  The review board affirmed the termination after evaluating the termination and hearing from Bullard.  Based on the undisputed facts presented to Bryner, McCauley and the review board, they were entitled to exercise business judgment and find that Bullard's disregard of Baer's instructions and requests was consistent with her employment history that demonstrated repeated issues with holding employees accountable and with addressing employee

42

performance issues contrary to her supervisors' wishes.  Bullard's efforts to characterize her actions as a simple misunderstanding do not undermine the facts and reasoning supporting Goodyear's legitimate and non-discriminatory justification.  In sum, Bullard has not met her burden to demonstrate that "the employer's proffered explanation is unworthy of credence." *Zamora v. Elite Logistics, Inc.*, 478 F.3d 1160, 1166 (10th Cir. 2007).

**AGE DISCRIMINATION**

The ADEA makes it "unlawful for an employer . . . to discharge any individual . . . because of such individual's age."  29 U.S.C. § 623(a)(1). To meet the ADEA's requirement of "but-for" causation, the plaintiff must establish by a preponderance of the evidence that her employer would not have discharged her but for her age.  *Gross v. FBL Fin. Servs., Inc.*, 129 S.Ct. 2343, 2351 (2009).  "*Gross* does not disturb longstanding Tenth Circuit precedent by placing a heightened evidentiary requirement on ADEA plaintiffs to prove that age was the sole cause of the adverse employment action."  *Jones v. Oklahoma City Public Schools*, 617 F.3d 1273, 1278 (10th Cir. 2010).  *Gross* also does not "preclude our continued application of *McDonnell Douglas* to ADEA claims."  *Id*.

The plaintiff does not assert any direct evidence of discrimination, so her ADEA claim is evaluated under the *McDonnell Douglas* framework.  The court finds that the plaintiff has established a prima facie

43

for age discrimination as she was replaced by a younger person. *Wilkerson v. Shinseki*, 606 F.3d 1256, 1266 (10th Cir. 2010). For the same reasons stated under the gender discrimination claim, the court finds that the plaintiff has satisfied the element of satisfactory work performance. Goodyear comes forward with same non-discriminatory reason for Bullard's termination--her mishandling of Johnson's discipline in disregarding Baer's wishes and her actions being a violation of the 2004 Last Chance Letter.

The plaintiff can avoid summary judgment by presenting sufficient evidence to raise a genuine dispute of material fact regarding whether the defendant's articulated reason for the adverse employment action is pretextual. *See Reeves v. Sanderson Plumbing Prods., Inc.*, 530 U.S. 133, 147–49 (2000). "Pretext exists when an employer does not honestly represent its reasons for terminating an employee." *Miller v. Eby Realty Group LLC*, 396 F.3d 1105, 1111 (10th Cir. 2005). Thus, the inquiry is not whether the employer's reasons were wise, fair or correct but whether the employer honestly believed its reasons and acted in good faith upon them. Because even a mistaken belief can be a non-pretextual justification for termination, the court considers the facts as appearing to the decision-maker, and it does not second-guess the employer's decision even if in hindsight the action could be seen as poor business judgment. A court is not to act as a "super personnel department," and second-guess an employers'

44

honestly held, but mistaken, business judgments. *Riggs v. Airtran Airways, Inc.*, 497 F.3d 1108, 1118–19 (10th Cir. 2007) (citations and internal quotation marks omitted).

Besides incorporating all her prior arguments of pretext that the court has considered and already rejected as insufficient, the plaintiff argues pretext in that despite her experience she was paid less than two of the three area managers who were younger than she. The plaintiff mentions Mr. Pfeiffer's comment that she should retire and find other work and that he offered to transfer her to any plant job outside his area. The plaintiff also refers to having overheard Pfeiffer making an angry comment that was age inappropriate.

The plaintiff's evidence of the salary disparity does not show a pattern or practice supporting an inference of age discrimination and undermining the defendant's non-discriminatory reason. Of the six area managers, there were four area managers with higher salaries than Bullard, and three of them were paid only slightly more (less than 5%) and their ages were 51, 37 and 35. One area manager was paid significantly more (over 20%), and her age was 48. One area manager was paid less (over 5%), and his age was 39. This salary schedule hardly submits to an inference of age discrimination, particularly when one considers Bullard's extended history of disciplinary problems and repeated unsatisfactory job

evaluations.  The court detects no pattern of pay disparity on the basis of age to sustain a showing of pretext.

The plaintiff's other asserted evidence of pretext is age-related comments made by Pfeiffer.  The plaintiff testified that Pfeiffer made the retirement suggestion in 2004 or 2005 and that she overheard Pfeiffer make a derogatory age reference more than a year before her termination. Pfeiffer was not involved in the decision to terminate Bullard.  Thus, the plaintiff has not shown any nexus between this circumstantial evidence and the decision to terminate her.  *See English v. Colorado Dept. of Corrections*, 248 F.3d 1002, 1010 (2001).  "[S]tray remarks" and "[i]solated comments, unrelated to the challenged action, are insufficient to show discriminatory animus in termination decisions."  *Cone v. Longmont United Hosp. Ass'n*, 14 F.3d 526, 531 (10th Cir. 1994).  There is nothing in this evidence that rebuts Goodyear's evidence of having terminated Bullard for her mishandling of Johnson's discipline and her poor record in handling employee discipline. In sum, the plaintiff's evidence is insufficient to carry her burden of showing pretext.

**NLRA CLAIM**

The pretrial order states for this claim that the plaintiff is alleging she was terminated because she opposed practices prohibited by the NLRA. (Dk. 62, pp. 10, 15-16).  Goodyear argues for dismissal as jurisdiction over

46

such claims resides in the first instance with the National Labor Relations

Board ("NLRB").  In response, the plaintiff clarifies her claim arises under §

8(a)(1) of the NLRA, but she offers nothing to refute Goodyear's

jurisdictional challenge.

  For activity subject to section 7 or section 8 of the NLRA, federal

courts must defer to the exclusive competence of the NLRB. *San Diego Bldg.*

*Trades Council, Millmen's Union, Local 2020 v. Garmon*, 359 U.S. 236, 246

(1959); *Peabody Galion v. Dollar*, 666 F.2d 1309, 1314 (10th Cir.1981).

"Activities that are arguably protected by section 7 or prohibited by section 8

of the NLRA must be determined 'in the first instance [by] the [NLRB].'"

*Silchia v. MCI Telecommunications Corp.*, 942 F. Supp. 1369, 1373 (D. Colo.

1996) (quoting *Garmon*, 359 U.S. at 244-245).  The *Garmon* doctrine gives

the NLRB "exclusive jurisdiction over unfair labor practices prohibited by the

NLRA."  *Cumpston v. Dyncorp Technical Service, Inc.*, 76 Fed. Appx. 861,

865, 2003 WL 21921919 at *4 (10th Cir. 2003); *see also United Ass'n of*

*Journeymen and Apprentices v. Bechtel Power Corp.*, 834 F.2d 884, 886-87

(10th Cir. 1987), *cert. denied*, 486 U.S. 1055 (1988).  Based on allegations

of anti-union retaliation amounting to a violation of the NLRA, the plaintiff's

claim is thereby barred by *Garmon* preemption, and the claim is dismissed

for lack of jurisdiction.  *See Clements v. Smith's Food & Drug Centers, Inc.*,

2007 WL 1815675 at *7 (D. Utah 2007); *Conner v. The Boeing Co.*, 2006

WL 1487007 at *3 (D. Kan. 2006).

IT IS THEREFORE ORDERED that Goodyear's motion for summary judgment (Dk. 68) is granted as to the plaintiff's claims for relief under Title VII and ADEA and is granted insofar as the plaintiff's NLRA claim is dismissed for lack of jurisdiction.

Dated this 14th day of September, 2011, Topeka, Kansas.


s/ Sam A. Crow
Sam A. Crow, U.S. District Senior Judge